LOUISIANA EX REL. FRANCIS *v.* RESWEBER, SHERIFF, ET AL.

No. 142. Argued November 18, 1946.—Decided January 13, 1947.

460

*James Skelly Wright* argued the cause for petitioner. With him on the brief were *Robert E. Kline, Jr.* and *John L. Ingoldsby, Jr.*

*Michael E. Culligan* and *L. O. Pecot* argued the cause and filed a brief for respondents.

Mr. Justice Reed announced the judgment of the Court in an opinion in which The Chief Justice, Mr. Justice Black and Mr. Justice Jackson join.

This writ of certiorari brings before this Court a unique situation. The petitioner, Willie Francis, is a colored citizen of Louisiana. He was duly convicted of murder and in September, 1945, sentenced to be electrocuted for the crime. Upon a proper death warrant, Francis was prepared for execution and on May 3, 1946, pursuant to the warrant, was placed in the official electric chair of the State of Louisiana in the presence of the authorized witnesses. The executioner threw the switch but, presumably because of some mechanical difficulty, death did not result. He was thereupon removed from the chair and returned to prison where he now is. A new death warrant was issued

by the Governor of Louisiana, fixing the execution for May 9, 1946.

Applications to the Supreme Court of the state were filed for writs of certiorari, mandamus, prohibition and habeas corpus, directed to the appropriate officials in the state. Execution of the sentence was stayed. By the applications petitioner claimed the protection of the due process clause of the Fourteenth Amendment on the ground that an execution under the circumstances detailed would deny due process to him because of the double jeopardy provision of the Fifth Amendment and the cruel and unusual punishment provision of the Eighth Amendment.[1] These federal constitutional protections, petitioner claimed, would be denied because he had once gone through the difficult preparation for execution and had once received through his body a current of electricity intended to cause death. The Supreme Court of Louisiana denied the applications on the ground of a lack of any basis for judicial relief. That is, the state court concluded there was no violation of state or national law alleged in the various applications. It spoke of the fact that no "current of sufficient intensity to cause death" passed through petitioner's body. It referred specifically to the fact that the applications of petitioner invoked the provisions of the Louisiana Constitution against cruel and inhuman punishments and putting one in jeopardy of life or liberty twice for the same offense. We granted certiorari on a petition setting forth the aforementioned contentions, to consider the alleged violations of rights under the Federal Constitution in the unusual circumstances of this case. 328 U. S. 833. For matters of state law, the opin-

---

[1] Fifth Amendment: ". . . nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; . . ."

Eighth Amendment: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

ion and order of the Supreme Court of Louisiana are binding on this Court, *Hebert* v. *Louisiana,* 272 U. S. 312, 317. So far as we are aware, this case is without precedent in any court.

To determine whether or not the execution of the petitioner may fairly take place after the experience through which he passed, we shall examine the circumstances under the assumption, but without so deciding, that violation of the principles of the Fifth and Eighth Amendments, as to double jeopardy and cruel and unusual punishment, would be violative of the due process clause of the Fourteenth Amendment.[2] As nothing has been brought to our attention to suggest the contrary, we must and do assume that the state officials carried out their duties under the death warrant in a careful and humane manner. Accidents happen for which no man is to blame. We turn to the question as to whether the proposed enforcement of the criminal law of the state is offensive to any constitutional requirements to which reference has been made.

*First.* Our minds rebel against permitting the same sovereignty to punish an accused twice for the same offense. *Ex parte Lange,* 18 Wall. 163, 168, 175; *In re Bradley,* 318 U. S. 50. Compare *United States* v. *Lanza,* 260 U. S. 377, 382. But where the accused successfully seeks review of a conviction, there is no double jeopardy upon a new trial. *United States* v. *Ball,* 163 U. S. 662, 672. See *People* v. *Trezza,* 128 N. Y. 529, 535, 28 N. E. 533. Even where a state obtains a new trial after conviction because of errors, while an accused may be placed on trial a second time, it is not the sort of hardship to the accused that is forbidden by the Fourteenth Amendment.

---

[2] See *Twining* v. *New Jersey,* 211 U S. 78, 99; *Palko* v. *Connecticut,* 302 U. S. 319, 324; *In re Kemmler,* 136 U. S. 436, 445; *Collins* v. *Johnston,* 237 U. S. 502, 510.

*Palko* v. *Connecticut*, 302 U. S. 319, 328.[3]  As this is a prosecution under state law, so far as double jeopardy is concerned, the *Palko* case is decisive.  For we see no difference from a constitutional point of view between a new trial for error of law at the instance of the state that results in a death sentence instead of imprisonment for life and an execution that follows a failure of equipment.  When an accident, with no suggestion of malevolence, prevents the consummation of a sentence, the state's subsequent course in the administration of its criminal law is not affected on that account by any requirement of due process under the Fourteenth Amendment.  We find no double jeopardy here which can be said to amount to a denial of federal due process in the proposed execution.

*Second.*  We find nothing in what took place here which amounts to cruel and unusual punishment in the constitutional sense.  The case before us does not call for an examination into any punishments except that of death.  See *Weems* v. *United States,* 217 U. S. 349.  The traditional humanity of modern Anglo-American law forbids the infliction of unnecessary pain in the execution of the death sentence.  Prohibition against the wanton infliction of pain has come into our law from the Bill of Rights of 1688.  The identical words appear in our Eighth Amendment.  The Fourteenth would prohibit by its due process clause execution by a state in a cruel manner.[4]

---

[3] See *Kepner* v. *United States,* 195 U. S. 100, 129; cf. *United States* v. *Ball,* 163 U. S. 662, 666–70.

[4] This Court said of a similar clause embodied in the constitution of New York, *In re Kemmler,* 136 U. S. 436, 446:

"... but the language in question as used in the constitution of the State of New York was intended particularly to operate upon the legislature of the State, to whose control the punishment of crime was almost wholly confided.  So that, if the punishment prescribed for an offence against the laws of the State were mani-

Petitioner's suggestion is that because he once underwent the psychological strain of preparation for electrocution, now to require him to undergo this preparation again subjects him to a lingering or cruel and unusual punishment. Even the fact that petitioner has already been subjected to a current of electricity does not make his subsequent execution any more cruel in the constitutional sense than any other execution. The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely. The fact that an unforeseeable accident prevented the prompt consummation of the sentence cannot, it seems to us, add an element of cruelty to a subsequent execution. There is no purpose to inflict unnecessary pain nor any unnecessary pain involved in the proposed execution. The situation of the unfortunate victim of this accident is just as though he had suffered the identical amount of mental anguish and physical pain in any other occurrence, such as, for example, a fire in the cell block. We cannot agree that the hardship imposed upon the petitioner rises to that level of hardship denounced as denial of due process because of cruelty.

---

festly cruel and unusual, as burning at the stake, crucifixion, breaking on the wheel, or the like, it would be the duty of the courts to adjudge such penalties to be within the constitutional prohibition."

It added, p. 447:

"Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the Constitution. It implies there something inhuman and barbarous, something more than the mere extinguishment of life."

Louisiana has the same humane provision in its constitution. Louisiana Constitution, Art. I, § 12. The *Kemmler* case denied that electrocution infringed the federal constitutional rights of a convicted criminal sentenced to execution.

*Third.* The Supreme Court of Louisiana also rejected petitioner's contention that death inflicted after his prior sufferings would deny him the equal protection of the laws, guaranteed by the Fourteenth Amendment. This suggestion in so far as it differs from the due process argument is based on the idea that execution, after an attempt at execution has failed, would be a more severe punishment than is imposed upon others guilty of a like offense. That is, since others do not go through the strain of preparation for execution a second time or have not experienced a non-lethal current in a prior attempt at execution, as petitioner did, to compel petitioner to submit to execution after these prior experiences denies to him equal protection. Equal protection does not protect a prisoner against even illegal acts of officers in charge of him, much less against accidents during his detention for execution. See *Lisenba* v. *California,* 314 U. S. 219, 226. Laws cannot prevent accidents nor can a law equally protect all against them. So long as the law applies to all alike, the requirements of equal protection are met. We have no right to assume that Louisiana singled out Francis for a treatment other than that which has been or would generally be applied.

*Fourth.* There is a suggestion in the brief that the original trial itself was so unfair to the petitioner as to justify a reversal of the judgment of conviction and a new trial. Petitioner's claim in his brief is that he was inadequately represented by counsel. The record of the original trial presented to us shows the warrant for arrest, the indictment, the appointment of counsel and the minute entries of trial, selection of jury, verdict and sentence. There is nothing in any of these papers to show any violation of petitioner's constitutional rights. See *Carter* v. *Illinois,* 329 U. S. 173. Review is sought here because of a denial of due process of law that would be brought about by execution of petitioner after failure of the first effort to electrocute him. Nothing is before us upon which a ruling

can be predicated as to alleged denial of federal constitutional rights during petitioner's trial. On this record, we see nothing upon which we could conclude that the constitutional rights of petitioner were infringed.

*Affirmed.*

Mr. Justice Frankfurter, concurring.

When four members of the Court find that a State has denied to a person the due process which the Fourteenth Amendment safeguards, it seems to me important to be explicit regarding the criteria by which the State's duty of obedience to the Constitution must be judged. Particularly is this so when life is at stake.

Until July 28, 1868, when the Fourteenth Amendment was ratified, the Constitution of the United States left the States free to carry out their own notions of criminal justice, except insofar as they were limited by Article I, § 10 of the Constitution which declares: "No State shall . . . pass any Bill of Attainder, [or] ex post facto Law . . ." The Fourteenth Amendment placed no specific restraints upon the States in the formulation or the administration of their criminal law. It restricted the freedom of the States generally, so that States thereafter could not "abridge the privileges or immunities of citizens of the United States," or "deprive any person of life, liberty, or property, without due process of law," or "deny to any person within its jurisdiction the equal protection of the laws."

These are broad, inexplicit clauses of the Constitution, unlike specific provisions of the first eight amendments formulated by the Founders to guard against recurrence of well-defined historic grievances. But broad as these clauses are, they are not generalities of empty vagueness. They are circumscribed partly by history and partly by the problems of government, large and dynamic

though they be, with which they are concerned. The "privileges or immunities of citizens of the United States" concern the dual citizenship under our federal system. The safeguards of "due process of law" and "the equal protection of the laws" summarize the meaning of the struggle for freedom of English-speaking peoples. They run back to Magna Carta but contemplate no less advances in the conceptions of justice and freedom by a progressive society. See the classic language of Mr. Justice Matthews in *Hurtado* v. *California*, 110 U. S. 516, 530–31.

When, shortly after its adoption, the Fourteenth Amendment came before this Court for construction, it was urged that the "privileges or immunities of citizens of the United States" which were not to be abridged by any State were the privileges and immunities which citizens theretofore enjoyed under the Constitution. If that view had prevailed, the Privileges or Immunities Clause of the Fourteenth Amendment would have placed upon the States the limitations which the specific articles of the first eight amendments had theretofore placed upon the agencies of the national government. After the fullest consideration that view was rejected. The rejection has the authority that comes from contemporaneous knowledge of the purposes of the Fourteenth Amendment. See *Slaughter-House Cases,* 16 Wall. 36, 67–68; *Davidson* v. *New Orleans,* 96 U. S. 97. The notion that the Privileges or Immunities Clause of the Fourteenth Amendment absorbed, as it is called, the provisions of the Bill of Rights that limit the Federal Government has never been given countenance by this Court.

Not until recently was it suggested that the Due Process Clause of the Fourteenth Amendment was merely a compendious reference to the Bill of Rights whereby the States were now restricted in devising and enforcing their penal code precisely as is the Federal Government by the

first eight amendments. On this view, the States would be confined in the enforcement of their criminal codes by those views for safeguarding the rights of the individual which were deemed necessary in the eighteenth century. Some of these safeguards have perduring validity. Some grew out of transient experience or formulated remedies which time might well improve. The Fourteenth Amendment did not mean to imprison the States into the limited experience of the eighteenth century. It did mean to withdraw from the States the right to act in ways that are offensive to a decent respect for the dignity of man, and heedless of his freedom.

These are very broad terms by which to accommodate freedom and authority. As has been suggested from time to time, they may be too large to serve as the basis for adjudication, in that they allow much room for individual notions of policy. That is not our concern. The fact is that the duty of such adjudication on a basis no less narrow has been committed to this Court.

In an impressive body of decisions this Court has decided that the Due Process Clause of the Fourteenth Amendment expresses a demand for civilized standards which are not defined by the specifically enumerated guarantees of the Bill of Rights. They neither contain the particularities of the first eight amendments nor are they confined to them. That due process of law has its own independent function has been illustrated in numerous decisions, and has been expounded in the opinions of the Court which have canvassed the matter most thoroughly. See *Hurtado* v. *California, supra; Twining* v. *New Jersey,* 211 U. S. 78; *Snyder* v. *Massachusetts,* 291 U. S. 97; *Palko* v. *Connecticut,* 302 U. S. 319. Insofar as due process under the Fourteenth Amendment requires the States to observe any of the immunities "that are valid as against the federal government by force of the specific pledges of particular amendments," it does so because they "have

been found to be implicit in the concept of ordered liberty, and thus, through the Fourteenth Amendment, become valid as against the states." *Palko* v. *Connecticut, supra,* at 324–25.

The Federal Bill of Rights requires that prosecutions for federal crimes be initiated by a grand jury and tried by a petty jury; it protects an accused from being a witness against himself. The States are free to consult their own conceptions of policy in dispensing with the grand jury, in modifying or abolishing the petty jury, in withholding the privilege against self-crimination. See *Maxwell* v. *Dow,* 176 U. S. 581; *Twining* v. *New Jersey, supra; Snyder* v. *Massachusetts, supra; Palko* v. *Connecticut, supra,* at 323, 324; *cf. Feldman* v. *United States,* 322 U. S. 487. In short, the Due Process Clause of the Fourteenth Amendment did not withdraw the freedom of a State to enforce its own notions of fairness in the administration of criminal justice unless, as it was put for the Court by Mr. Justice Cardozo, "in so doing it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder* v. *Massachusetts, supra,* at 105.

A State may offend such a principle of justice by brutal subjection of an individual to successive retrials on a charge on which he has been acquitted. Such conduct by a State might be a denial of due process, but not because the protection against double jeopardy in a federal prosecution against which the Fifth Amendment safeguards limits a State. For the disputations that are engendered by technical aspects of double jeopardy as enshrined in the Fifth Amendment, see the majority and dissenting opinions in *Ex parte Lange,* 18 Wall. 163, and *In re Bradley,* 318 U. S. 50. Again, a State may be found to deny a person due process by treating even one guilty of crime in a manner that violates standards of decency more or less universally accepted though not when it treats him

by a mode about which opinion is fairly divided. But the penological policy of a State is not to be tested by the scope of the Eighth Amendment and is not involved in the controversy which is necessarily evoked by that Amendment as to the historic meaning of "cruel and unusual punishment." See *Weems* v. *United States,* 217 U. S. 349, and particularly the dissenting opinion of White and Holmes, JJ.

Once we are explicit in stating the problem before us in terms defined by an unbroken series of decisions, we cannot escape acknowledging that it involves the application of standards of fairness and justice very broadly conceived. They are not the application of merely personal standards but the impersonal standards of society which alone judges, as the organs of Law, are empowered to enforce. When the standards for judicial judgment are not narrower than "immutable principles of justice which inhere in the very idea of free government," *Holden* v. *Hardy,* 169 U. S. 366, 389, "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions," *Hebert* v. *Louisiana,* 272 U. S. 312, 316, "immunities . . . implicit in the concept of ordered liberty," *Palko* v. *Connecticut, supra,* at 324–25, great tolerance toward a State's conduct is demanded of this Court. Such were recently stated to be "the controlling principles." See Mr. Chief Justice Stone in *Malinski* v. *New York,* 324 U. S. 401, 438, in connection with the concurring opinion in that case, *ibid.,* 412, 416, 417.

I cannot bring myself to believe that for Louisiana to leave to executive clemency, rather than to require, mitigation of a sentence of death duly pronounced upon conviction for murder because a first attempt to carry it out was an innocent misadventure, offends a principle of justice "rooted in the traditions and conscience of our people." See *Snyder* v. *Massachusetts, supra,* at 105. Short of

the compulsion of such a principle, this Court must abstain from interference with State action no matter how strong one's personal feeling of revulsion against a State's insistence on its pound of flesh. One must be on guard against finding in personal disapproval a reflection of more or less prevailing condemnation. Strongly drawn as I am to some of the sentiments expressed by my brother BURTON, I cannot rid myself of the conviction that were I to hold that Louisiana would transgress the Due Process Clause if the State were allowed, in the precise circumstances before us, to carry out the death sentence, I would be enforcing my private view rather than that consensus of society's opinion which, for purposes of due process, is the standard enjoined by the Constitution.

The fact that I reach this conclusion does not mean that a hypothetical situation, which assumes a series of abortive attempts at electrocution or even a single, cruelly willful attempt, would not raise different questions. When the Fourteenth Amendment first came here for application the Court abstained from venturing even a tentative definition of due process. With wise forethought it indicated that what may be found within or without the Due Process Clause must inevitably be left to "the gradual process of judicial inclusion and exclusion, as the cases presented for decision shall require, with the reasoning on which such decisions may be founded." *Davidson* v. *New Orleans, supra,* at 104. This is another way of saying that these are matters which depend on "differences of degree. The whole law does so as soon as it is civilized." Holmes, J., in *LeRoy Fibre Co.* v. *Chicago, M. & St. P. R. Co.,* 232 U. S. 340, 354. Especially is this so as to questions arising under the Due Process Clause. A finding that in this case the State of Louisiana has not gone beyond its powers is for me not the starting point for abstractly logical extension. Since I cannot say that it would be "repugnant to the conscience of mankind,"

472

*Palko* v. *Connecticut, supra,* at 323, for Louisiana to exercise the power on which she here stands, I cannot say that the Constitution withholds it.

MR. JUSTICE BURTON, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE MURPHY and MR. JUSTICE RUTLEDGE concur, dissenting.

Under circumstances unique in judicial history, the relator asks this Court to stay his execution on the ground that it will violate the due process of law guaranteed to him by the Constitution of the United States. We believe that the unusual facts before us require that the judgment of the Supreme Court of Louisiana be vacated and that this cause be remanded for further proceedings not inconsistent with this opinion. Those proceedings should include the determination of certain material facts not previously determined, including the extent, if any, to which electric current was applied to the relator during his attempted electrocution on May 3, 1946. Where life is to be taken, there must be no avoidable error of law or uncertainty of fact.

The relator's execution was ordered by the Governor of Louisiana to take place May 3, 1946. Of the proceedings on that day, the Supreme Court of Louisiana has said:

". . . between the Hours of 12:00 o'clock noon and 3:00 o'clock p. m., Willie Francis was strapped in the electric chair and an attempt was made to electrocute him, but, because of some defect in the apparatus devised and used for electrocutions, the contrivance failed to function, and after an unsuccessful attempt to electrocute Francis he was removed from the chair."

Of the same proceedings, the State's brief says:

"Through a latent electrical defect, the attempt to electrocute Francis failed, the State contending no

current whatsoever reached Francis' body, the relator contending a current of electricity did pass through his body; but in any event, Willie Francis was not put to death."

On May 8, the death warrant was canceled, and the relator's execution has been stayed pending completion of these proceedings. The Governor proposes to issue another death warrant for the relator's electrocution and the relator now asks this Court to prevent it for the reason that, under the present unique circumstances, his electrocution will be so cruel and unusual as to violate the due process clause of the Fourteenth Amendment to the Constitution of the United States.

That Amendment provides: "nor shall any State deprive any person of life, liberty, or property, without due process of law; . . . ." When this was adopted in 1868, there long had been imbedded deeply in the standards of this nation a revulsion against subjecting guilty persons to torture culminating in death. Preconstitutional American history reeked with cruel punishment to such an extent that, in 1791, the Eighth Amendment to the Constitution of the United States expressly imposed upon federal agencies a mandate that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Louisiana and many other states have adopted like constitutional provisions. See Section 12 of Article I of the Constitution of Louisiana (1921).

The capital case before us presents an instance of the violation of constitutional due process that is more clear than would be presented by many lesser punishments prohibited by the Eighth Amendment or its state counterparts. Taking human life by unnecessarily cruel means shocks the most fundamental instincts of civilized man. It should not be possible under the constitutional proce-

dure of a self-governing people. Abhorrence of the cruelty of ancient forms of capital punishment has increased steadily until, today, some states have prohibited capital punishment altogether. It is unthinkable that any state legislature in modern times would enact a statute expressly authorizing capital punishment by repeated applications of an electric current separated by intervals of days or hours until finally death shall result. The Legislature of Louisiana did not do so. The Supreme Court of Louisiana did not say that it did. The Supreme Court of Louisiana said merely that the pending petitions for relief in this case presented an executive rather than a judicial question and, by that mistake of law, it precluded itself from discussing the constitutional issue before us.

In determining whether the proposed procedure is unconstitutional, we must measure it against a lawful electrocution. The contrast is that between instantaneous death and death by installments—caused by electric shocks administered after one or more intervening periods of complete consciousness of the victim. Electrocution, when instantaneous, *can* be inflicted by a state in conformity with due process of law. *In re Kemmler,* 136 U. S. 436. The Supreme Court of Louisiana has held that electrocution, in the manner prescribed in its statute, is more humane than hanging. *State ex rel. Pierre* v. *Jones,* 200 La. 807, 9 So. 2d 42, cert. denied, 317 U. S. 633. See also, *Malloy* v. *South Carolina,* 237 U. S. 180.

The all-important consideration is that the execution shall be so instantaneous and substantially painless that the punishment shall be reduced, as nearly as possible, to no more than that of death itself. Electrocution has been approved only in a form that eliminates suffering.

The Louisiana statute makes this clear. It provides that:

> "Every sentence of death imposed in this State shall be by electrocution; that is, causing to pass

through the body of the person convicted a current
of electricity of sufficient intensity to cause death, and
the application and continuance of such current
through the body of the person convicted until such
person is dead. . . ." La. Code of Criminal Proce-
dure (1928), Act No. 2, Art. 569, as amended by § 1,
Act No. 14, 1940.

It does not provide for electrocution by interrupted or
repeated applications of electric current at intervals of
several days or even minutes. It does not provide for the
application of electric current of an intensity less than that
sufficient to cause death. It prescribes expressly and
solely for the application of a current of sufficient intensity
to cause death and for the *continuance* of that application
until death results. Prescribing capital punishment, it
should be construed strictly. There can be no implied
provision for a second, third or multiple application of the
current. There is no statutory or judicial precedent
upholding a delayed process of electrocution.

These considerations were emphasized in *In re Kemmler,*
*supra,* when an early New York statute authorizing elec-
trocution was attacked as violative of the due process
clause of the Fourteenth Amendment because prescribing
a cruel and unusual punishment. In upholding that stat-
ute, this Court stressed the fact that the electric current
was to cause instantaneous death. Like the Louisiana
statute before us, that statute called expressly for the con-
tinued application of a sufficient electric current to cause
death. It was the resulting "instantaneous" and "pain-
less" death that was referred to as "humane."

After quoting the New York County and Supreme
Courts, this Court quoted the New York Court of Appeals,
at 119 N. Y. 579, as follows:

" 'We have examined this testimony and can find but
little in it to warrant the belief that this new mode
of execution is cruel, within the meaning of the con-

476

stitution, though it is certainly unusual. On the contrary, we agree with the court below that it removes every reasonable doubt that the application of electricity to the vital parts of the human body, *under such conditions and in the manner contemplated by the statute, must result in instantaneous, and consequently in painless, death.'* " (Italics supplied.) *In re Kemmler, supra,* at 443–444.

Finally, speaking for itself, this Court said:

*"Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the Constitution. It implies there something inhuman and barbarous, something more than the mere extinguishment of life."* (Italics supplied.) *Id.* at 447.

If the state officials deliberately and intentionally had placed the relator in the electric chair five times and, each time, had applied electric current to his body in a manner not sufficient, until the final time, to kill him, such a form of torture would rival that of burning at the stake. Although the failure of the first attempt, in the present case, was unintended, the reapplication of the electric current will be intentional. How many deliberate and intentional reapplications of electric current does it take to produce a cruel, unusual and unconstitutional punishment? While five applications would be more cruel and unusual than one, the uniqueness of the present case demonstrates that, today, two separated applications are sufficiently "cruel and unusual" to be prohibited. If five attempts would be "cruel and unusual," it would be difficult to draw the line between two, three, four and five. It is not difficult, however, as we here contend, to draw the line between the one continuous application prescribed by statute and any other application of the current.

Lack of intent that the first application be less than fatal is not material. The intent of the executioner cannot lessen the torture or excuse the result. It was the statutory duty of the state officials to make sure that there was no failure. The procedure in this case contrasts with common knowledge of precautions generally taken elsewhere to insure against failure of electrocutions. The high standard of care generally taken evidences the significance properly attached to the unconditional requirement of a single continued application of the current until death results. In our view of this case, we are giving careful recognition to the law of Louisiana. Neither the Legislature nor the Supreme Court of Louisiana has expressed approval of electrocution other than by one continuous application of a lethal current.

Executive clemency provides a common means of avoiding unconstitutional or otherwise questionable executions. When, however, the unconstitutionality of proposed executive procedure is brought before this Court, as in this case, we should apply the constitutional protection. In this case, final recourse is had to the high trusteeship vested in this Court by the people of the United States over the constitutional process by which their own lives may be taken.

In determining whether a case of cruel and unusual punishment constitutes a violation of due process of law, each case must turn upon its particular facts. The record in this case is not limited to an instance where a prisoner was placed in the electric chair and released before being subjected to the electric current. It presents more than a case of mental anguish, however severe such a case might be. The petition to the Supreme Court of Louisiana expressly states that a current of electricity was caused to pass through the body of the relator. This allegation was de-

nied in the answer and no evidence was presented by either side. The Supreme Court of Louisiana thereupon undertook to decide the case on the pleadings. It said:

> "Our conclusion is that the complaint made by the relator is a matter over which the courts have no authority. Inasmuch as the proceedings had in the district court, up to and including the pronouncing of the sentence of death, were entirely regular, we have no authority to set aside the sentence and release the relator from the sheriff's custody." [1]

This statement assumed that the relief sought in the Supreme Court of Louisiana was only a review of the judicial proceedings in the lower state courts prior to the passing of sentence upon the relator on September 14, 1945. On the contrary, the issue raised there and here primarily concerns the action of state officials on and after May 3, 1946, in connection with their past and proposed attempts to electrocute the relator. This issue properly presents a federal constitutional question based on the impending deprivation of the life of the relator by executive officials of the State of Louisiana in a manner alleged

---

[1] That court, in discussing the pleadings, also said:

"In this latter answer or opposition it is admitted that the attempt was made to electrocute Willie Francis on May 3, 1946, in obedience of the death warrant, but it is averred that through some latent electrical defect in the apparatus, no electric current reached the body of Willie Francis and for that reason the sentence of death was not carried out. We have no other evidence, of course, as to whether an electric current did reach the body of Willie Francis. The important fact, however, is that a current of sufficient intensity to cause death, as required by the statute on the subject, and by the death warrant, did not pass through the body of Willie Francis."

This means that, as long as the relator did not die, the court apparently regarded the carrying out of the death sentence as a purely executive function not subject to judicial review.

to be a violation of the due process of law guaranteed by the Fourteenth Amendment. The refusal of the writs necessarily denied the constitutional protection prayed for. In ruling against the relator on the pleadings, in the absence of further evidence, the Supreme Court of Louisiana must be taken to have acted upon the allegations of fact most favorable to the relator. The petition contains the unequivocal allegation that the official electrocutioner "turned on the switch and a current of electricity was caused to pass through the body of relator, all in the presence of the official witnesses." This allegation must be read in the light of the Louisiana statute which authorized the electrocutioner to apply to the body of the relator only such an electric current as was of "sufficient intensity to cause death." On that record, denial of relief means that the proposed repeated, and at least second, application to the relator of an electric current sufficient to cause death is not, under present circumstances, a cruel and unusual punishment violative of due process of law. It exceeds any punishment prescribed by law. There is no precedent for it. What then is it, if it be not cruel, unusual and unlawful? In spite of the constitutional issue thus raised, the Supreme Court of Louisiana treated it as an executive question not subject to judicial review. We believe that if the facts are as alleged by the relator the proposed action is unconstitutional. We believe also that the Supreme Court of Louisiana should provide for the determination of the facts and then proceed in a manner not inconsistent with this opinion.

That counsel for both sides recognize the materiality of what occurred on May 3, 1946, is demonstrated by the affidavits and the transcript of testimony which they took from available public records and called to the attention of this Court by publication of them in connection with their respective briefs in this Court. Excerpts from those

480

public records, printed in the margin, indicate the conflict of testimony which should be resolved.[2]

The remand of this cause to the Supreme Court of Louisiana in the manner indicated would not mean that the

[2] The following excerpts are from copies of affidavits printed as appendices to the brief on behalf of the petitioner. The official witnesses named were persons charged by statute with the duty of making a signed report or "proces verbal" reciting the manner and date of the execution to be filed with the clerk of the court in which the sentence was imposed. La. Code of Criminal Procedure (1928), Act No. 2, Art. 571. The statements refer to what happened after the relator had been strapped into the electric chair and a hood placed before his eyes.

"Then the electrocutioner turned on the switch and when he did Willie Francis' lips puffed out and he groaned and jumped so that the chair came off the floor. Apparently the switch was turned on twice and then the condemned man yelled: 'Take it off. Let me breath.'" Affidavit of official witness Harold Resweber, dated May 23, 1946.

"I saw the electrocutioner turn on the switch and I saw his lips puff out and swell, his body tensed and stretched. I heard the one in charge yell to the man outside for more juice when he saw that Willie Francis was not dying and the one on the outside yelled back he was giving him all he had. Then Willie Francis cried out 'Take it off. Let me breath.' Then they took the hood from his eyes and unstrapped him.

. . . . .

"This boy really got a shock when they turned that machine on." Affidavit of official witness Ignace Doucet, dated May 30, 1946.

"After he was strapped to the chair the Sheriff of St. Martin Parish asked him if he had anything to say about anything and he said nothing. Then the hood was placed before his eyes. Then the officials in charge of the electrocution were adjusting the mechanisms and when the needle of the meter registered to a certain point on the dial, the electrocutioner pulled down on the switch and at the same time said: 'Goodby Willie.' At that very moment, Willie Francis' lips puffed out and his body squirmed and tensed and he jumped so that the chair rocked on the floor. Then the condemned man said: 'Take it off. Let me breath.' Then the switch was turned off. Then some of the men left and a few

relator necessarily is entitled to a complete release. It would mean merely that the courts of Louisiana must examine the facts, both as to the actual nature of the punishment already inflicted and that proposed to be inflicted and, if the proposed punishment amounts to a violation of due process of law under the Constitution of the United States, then the State must find some means of disposing of this case that will not violate that Constitution.

For the reasons stated, we are unable to concur in the judgment of this Court which affirms the judgment below.

---

minutes after the Sheriff of St. Martin Parish, Mr. E. L. Resweber, came in and announced that the governor had granted the condemned man a reprieve." Affidavit of official chaplain Reverend Maurice L. Rousseve, dated May 25, 1946.

Attached to the brief on behalf of the respondents there was submitted a copy of the transcript of testimony taken before the Louisiana Pardon Board on May 31, 1946, in support of the relator's application for executive clemency which was denied June 1, 1946. This transcript includes testimony of those who were in charge of the electrical equipment on May 3, to the effect that no electric current reached the body of the relator and that his flesh did not show electrical burns. It also included a statement by the sheriff of a neighboring parish, who accompanied the relator from the chair, that the relator told him on leaving the chair that the electric current had "tickled him."

These public records were not in existence and therefore not before the Supreme Court of Louisiana when it rendered its decision on May 15, 1946.