**Joe B. DRIVER, Petitioner,**

v.

**Arthur HINNANT, Superintendent, Halifax County Prison Unit of the North Carolina State Prison Department, Respondent.**

**Civ. No. 1639.**

United States District Court
E. D. North Carolina,
Raleigh Division.

June 24, 1965.

Anthony M. Brannon and J. Milton Read, Jr., Durham, N. C., for petitioner.

Covington & Burling, Peter Barton Hutt and Michael S. Horne, Washington, D. C., amici curiae.

T. Wade Bruton, Atty. Gen. of North Carolina, by Theodore S. Brown, Jr., Staff Atty., Raleigh, N. C., for respondent.

BUTLER, Chief Judge.

This application for writ of habeas corpus on behalf of a state prisoner presents the question whether the imprisonment of a chronic alcoholic for public drunkenness constitutes cruel and unusual punishment.

Joe B. Driver is confined pursuant to concurrent sentences of two years imprisonment imposed by the Superior Court of Durham County, North Carolina, upon his plea of guilty to two charges of a fifth offense of public drunkenness within a twelve-month period.[1] At the trial, petitioner testified:

> "I am fifty-eight years old and was first arrested for drunkenness at age twenty-four. Since then I have spent two-thirds of my life on the roads for drinking. Yes, sir, I consider myself an alcoholic. I want to do something about it, but it don't look like I can."

Further testimony by petitioner included this colloquy with the trial court:

> "THE COURT: If I counted correctly would it be right that you have been up for being publicly drunk two hundred and three times?
>
> "PETITIONER: I wouldn't doubt it, Your Honor. I have lost record of it.

> "THE COURT: Have you been up for larceny nine times?
>
> "PETITIONER: That was while I was drinking. I have never been in jail in my life but what it won't the cause of it.
>
> "THE COURT: You have been up for indecent exposure two times?
>
> "PETITIONER: I was drunk both of them times.
>
> "THE COURT: You have been up for being a common nuisance four times?
>
> "PETITIONER: Yes, sir, I was drunk and that's what they charged me with, a common nuisance.
>
> "THE COURT: I agree with you thoroughly that you are an alcoholic if I ever saw one."

Counsel appointed to represent petitioner at his trial appealed to the Supreme Court of North Carolina, contending that the sentence of imprisonment subjected petitioner to cruel and unusual punishment. The judgment was affirmed,[2] and petitioner now seeks federal habeas corpus relief.

After the filing of the application and the answer of respondent, it appeared to the court that only questions of law were raised and that there was no genuine issue as to any material fact. However, in the absence of a positive judicial finding that petitioner is an alcoholic, the court suggested an appropriate stipulation. The failure of respondent to do so compelled a plenary hearing to determine the question.

At the hearing, petitioner testified in his own behalf and offered in evidence the affidavit of Thomas T.

1. N.C.Gen.Stat. § 14–335: "If any person shall be found drunk or intoxicated on the public highway, or at any public place or meeting * * *: (12) In * * * Durham [County] * * * for the third offense within any twelve months' period such offense is declared a misdemeanor, punishable as a misdemeanor within the discretion of the court."

2. State v. Driver, 262 N.C. 92, 136 S.E.2d 208 (1964). The court said: "Undoubtedly, the Legislature may require the courts to take into account in fixing punishment the persistence of an accused in a course of criminal conduct. The prison authorities provide medical treatment for prisoners during their confinement. The argument of defense counsel in other matters addresses itself more properly to society and other agencies of government rather than to the criminal courts."

Jones, M.D., the pertinent parts of which are set out in the margin.[3] Petitioner filed with the court a certified copy of his criminal record as compiled by the Federal Bureau of Investigation.[4] Petitioner's evidence is uncontradicted by respondent,[5] and the court finds as a fact that petitioner is a chronic alcoholic.[6]

Relying on Robinson v. State of California,[7] petitioner contends that "criminal punishment of a chronic alcoholic, who is a sick person suffering from a disease, merely for publicly exhibiting the symptoms of that sickness and disease" is unconstitutional. The appellant in Robinson was convicted under a California statute which made it a misdemeanor, punishable by imprisonment, for any person to "be addicted to the use of narcotics." The trial court had instructed the jury that the offense was "a status or condition and not an act." The Supreme Court reversed, holding that narcotic addiction is a sickness and that to make a sickness a crime is to inflict cruel and unusual punishment in violation of the eighth and fourteenth amendments.[8]

It appears that this new approach [9] to the eighth amendment restricts the power of the states to define crime. The Court was not confronted with an inherently cruel method of punishment,[10] nor with a cruelly excessive punishment

---

3. "I hereby certify and make affidavit that Mr. Driver has been known to me for the past ten years or more. He has been a patient of mine on several occasions, and has been present many times in fellowship conferences or group therapy sessions.

"It is my opinion that Mr. Driver is alcoholic, and has suffered from chronic alcoholism for many years. Other diagnoses are also applicable:

"1. Chronic brain syndrome, secondary to chronic alcohol intoxication and to cerebrovascular arteriosclerosis.

"2. Personality disorder manifest by inadequate personality traits, depressive reaction (or melancholia), and emotional instability.

"3. Constitutional inadequacy or debility, including chronic malnutrition, avitaminosis, anginoid precordial pain and dyspnea on exertion, oral sepsis, cirrhosis of the liver, and chronic fatigue state."

4. The record reflects a total of two hundred and nine entries; one hundred and ninety-seven involve charges of public drunkenness.

5. Pursuant to 28 U.S.C.A. § 2246, respondent had the right to propound written interrogatories to Dr. Jones or to file answering affidavits. However, respondent filed a statement with the court electing not to do so.

6. For purpose of decision, the court adopts the definition of Congress that a chronic alcoholic is "any person who chronically and habitually uses alcoholic beverages to the extent that he has lost the power of self-control with respect to the use of such beverages." D.C.Code § 24–502 (1947). The court takes judicial notice of the congressional finding that a chronic alcoholic is a sick person in need of proper medical, institutional, and rehabilitative treatment. D.C.Code § 24–501 (1947).

7. 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

8. The early decisions stated that the eighth amendment was a limitation only on the federal government and did not apply to the states. In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890); O'Neil v. State of Vermont, 144 U.S. 323, 12 S.Ct. 693, 36 L.Ed. 450 (1892). However, confusion began when the question was expressly reserved in State of Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947); it continued in Johnson v. Dye, 175 F.2d 250 (3d Cir.), rev'd. per curiam on other grounds, 338 U.S. 864, 70 S.Ct. 146, 94 L.Ed. 530 (1949). The Court in Robinson apparently thought the question settled and unworthy of discussion, citing, inexplicably, Francis.

9. "Finally, I deem this application of 'cruel and unusual punishment' so novel that I suspect the Court was hard put to find a way to ascribe to the Framers of the Constitution the result reached today * * *" Robinson v. State of California, supra note 7, at 689, 82 S. Ct. at 1432 (White, J., dissenting).

10. See Wilkerson v. State of Utah, 99 U.S. 130, 25 L.Ed. 345 (1878); In re Kemmler, supra note 8; Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).

disproportionate to the offense;[11] rather, the punishment was deemed cruel because the conduct for which it was imposed should not be subjected to criminal sanction. By analogy the Court reasoned: "Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold."[12]

As interpreted by the California courts, the statute allowed imprisonment of a person although he was not guilty of any public manifestation of his addiction to narcotics, or any disorderly or irregular behavior. The North Carolina statute making a criminal offense of public drunkenness is clearly distinguishable. North Carolina does not make the "status" or "condition" of alcoholism a crime; rather, it punishes public drunkenness as an antisocial act. To the extent that Robinson involves considerations of substantive due process, it appears inapposite to this case.

Petitioner concedes that the North Carolina statute is constitutional on its face, but contends that under Robinson it is unconstitutional when applied to him. In substance, he argues that it is as cruel and unusual to punish the symptoms of a sickness as it is to punish the sickness itself, and he emphasizes the dissenting remark in Robinson that the decision may preclude punishment of a narcotic addict for the use of narcotics.[13]

Petitioner's argument of what the decision portends ignores the obvious attempt of the majority to limit its holding to the factual situation at hand. At the very outset, the Court stated:

"It would be possible to construe the statute under which the appellant was convicted as one which is operative only upon proof of the actual use of narcotics  *  *  * but the California courts have not so construed this law. Although there was evidence in the present case that the appellant had used narcotics  *  *  * the jury were instructed that they could convict him even if they disbelieved that evidence. The appellant could be convicted, they were told, if they found simply that the appellant's 'status' or 'chronic condition' was that of being 'addicted to the use of narcotics.' "[14]

The constitutional question was presented only because it was impossible to determine from the jury's verdict whether the appellant had been convicted upon precisely such a finding, or only upon proof of actual use.[15]

The ratio decidendi of Robinson is not clear, and it appears that the decision may raise more questions than it answers.[16] The closing language of the majority, however, is plain:

"We are not unmindful that the vicious evils of the narcotics traffic have occasioned the grave con-

---

11. See Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910).

12. Robinson v. State of California, supra note 7, at 667, 82 S.Ct. at 1421.

13. "If it is 'cruel and unusual punishment' to convict appellant for addiction, it is difficult to understand why it would be any less offensive to the Fourteenth Amendment to convict him for use on the same evidence of use which proved he was an addict. It is significant that in purporting to reaffirm the power of the states to deal with the narcotics traffic, the Court does not include among the obvious powers of the state the power to punish for the use of narcotics. I cannot think that the omission was inadvertent." Robinson v. State of California, supra note 7, at 688–9, 82 S.Ct. at 1431–2 (White, J., dissenting).

14. Id. at 665, 82 S.Ct. at 1420.

15. As to the decision of constitutional questions involving state statutes, compare the rules of policy stated in Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346, 56 S.Ct. 466, 482, 80 L.Ed. 688 (1936) (concurring opinion); Robinson v. State of California, Id. at 685, 82 S.Ct. at 1430, note 1 (dissenting opinion).

16. Thoughtful discussions of the case may be found in 51 Calif.L.Rev. 219 (1963) and 16 Stan.L.Rev. 996 (1964). One leading writer has observed that Robinson "may turn out to be  *  *  * 'a derelict on the waters of the law.' " Packer, Mens Rea And The Supreme Court, 1962 Supreme Court Review 107, 158.

cern of government. There are, as we have said, countless fronts on which those evils may be legitimately attacked. *We deal in this case only with an individual provision of a particularized local law* as it has so far been interpreted by the California courts." (Emphasis supplied.) [17]

The immediate result of the decision is equally plain: one phrase in the narcotics statute was invalidated; the substance of the statutory scheme punishing the use of narcotics was left intact.

■ Although "a principle, to be vital, must be capable of wider application than the mischief which gave it birth," [18] it would do far greater mischief for the court to extend Robinson as urged by petitioner. The court holds that the application of North Carolina's public drunkenness statute to petitioner does not subject him to cruel and unusual punishment by virtue of Robinson v. State of California.

Petitioner also contends that his punishment is disproportionately severe in relation to the offenses charged. Petitioner states that "it is incomprehensible that in 1965 it is necessary to have to argue that the legislature must tailor the punishment to fit the crime" and that "this concept has been so thoroughly imbued in our jurisdiction that the need for its citation has been slight." The sole authority cited by petitioner is Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910).

In Weems, the defendant, an American national, was a disbursing officer for the Coast Guard in Manila. He was convicted in a Philippine court of falsifying a public document recording wage payments by having entered as paid out 616 pesos. In an eloquent opinion by Mr. Justice McKenna, the Court graphically described the mandatory punishment provided by statute for the offense:

"Its minimum degree is confinement in a penal institution for twelve years and one day, a chain at the ankle and wrist of the offender, hard and painful labor, no assistance from friend or relative, no marital authority or parental rights or rights of property, no participation even in the family council. These parts of his penalty endure for the term of imprisonment. From other parts there is no intermission. His prison bars and chains are removed, it is true, after twelve years, but he goes from them to a perpetual limitation of his liberty. He is forever kept under the shadow of his crime, forever kept within voice and view of the criminal magistrate, not being able to change his domicil without giving notice to the 'authority immediately in charge of his surveillance,' and without permission in writing. He may not seek, even in other scenes and among other people, to retrieve his fall from rectitude. Even that hope is taken from him, and he is subject to tormenting regulations that, if not so tangible as iron bars and stone walls, oppress as much by their continuity, and deprive of essential liberty. No circumstance of degradation is omitted. It may be that even the cruelty of pain is not omitted. He must bear a chain night and day. He is condemned to painful as well as hard labor. What painful labor may mean we have no exact measure. It must be something more than hard labor. It may be hard labor pressed to the point of pain." [19]

The Court reversed, holding that the penalties violated the ban on cruel and

---

17. Robinson v. State of California, at supra note 7, 667–668, 82 S.Ct. at 1421.

18. Weems v. United States, supra note 11, 217 U.S. at 373, 30 S.Ct. at 551.

19. Id. at 366–367, 30 S.Ct. at 548–549. In addition, the statute imposed a minimum fine of 1,250 pesetas and "perpetual absolute disqualification" (permanent loss of right to vote, to hold public office, to receive retirement pay, etc.).

unusual punishment in the Philippine Bill of Rights.[20]

It appears that the decision was based upon fundamental considerations of decency after an inquiry entirely comparative in approach.[21] The Court found that the minimum punishment greatly exceeded the penalty provisions for similar offenses fixed by federal criminal statutes, and that, indeed, other Philippine statutes prescribed much less punishment for more serious crimes. These contrasts revealed that the proportion of prescribed punishment was aberrational and excessive in relation to the offense when viewed in the context of American criminal jurisprudence.[22]

The punishment in Weems was not cruel and unusual merely because of the length of the minimum term of imprisonment in relation to the gravity of the offense; rather, it was the combination of an excessive but conventional means of punishment with harsh alien refinements and accessory penalties that resulted in reversal.[23]

Weems is the only decision of the Court holding a punishment cruel and unusual on the ground that it was severely excessive in relation to the offense charged. Other attacks in the federal courts on the severity of fines and terms of imprisonment have failed. The decisions hold that a sentence within the limits of a valid statute cannot amount to cruel and unusual punishment. E. g., United States v. Rosenberg, 195 F.2d 583 (2d Cir.), cert. denied, 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 687 (1952) ; Smith v. United States, 273 F.2d 462 (10th Cir. 1959), cert. denied, 363 U.S. 846, 80 S. Ct. 1619, 4 L.Ed.2d 1729 (1960).

In the instant case, the offenses were punishable as misdemeanors [24] at common law ; [25] that is, the trial court had authority to impose a fine and sentence of two years imprisonment for each offense. State v. Wilson, 216 N.C. 130, 4 S.E.2d 440 (1939). It appears that the statute creating the offense is constitutional, State v. Dew, 248 N.C. 188, 102 S.E.2d 774 (1958), and that it is well settled in North Carolina that the authorized imprisonment is not cruel and unusual punishment. State v. Farrington, 141 N.C. 845, 53 S.E. 954 (1906). Statutory provisions for in-

---

20. The ban was taken from the Constitution of the United States, and thought to have the same meaning as the eighth amendment. Id. at 367, 30 S.Ct. at 549. "The ruling now made, therefore, is an interpretation of the 8th Amendment, and announces the limitation which that Amendment imposes on * * * legislative authority to define and punish crime. Id. at 384, 30 S.Ct. at 556 (dissenting opinion).

21. The use of such a comparative approach in attacks on the severity of punishment was repudiated in Badders v. United States, 240 U.S. 391, 36 S.Ct. 367, 60 L. Ed. 706 (1916), by the citation of an earlier case where the Court had said "that for other offenses, which may be considered by most, if not all, of a more grievous character, less punishments have been inflicted, does not make this sentence cruel." Howard v. Fleming, 191 U.S. 126, 135–136, 24 S.Ct. 49, 50, 48 L.Ed. 121 (1903).

22. "It must be confessed that [these penalties] * * * excite wonder in minds accustomed to a more considerate adaptation of punishment to the degree of crime." Id. at 365, 30 S.Ct. at 548. "Such penalties amaze those who have formed their conception of the relation of a state to even its offending citizens from the practice of the American commonwealths, and believe that it is a precept of justice that punishment for crime should be graduated and proportioned to offense." Id. 217 U.S. at 366–367, 30 S.Ct. at 549.

23. "It has no fellow in American legislation. Let us remember that it has come to us from a government of a different form and genus from ours. It is cruel in its excess of imprisonment *and* that which accompanies and follows imprisonment. It is unusual in its character. Its punishments come under the condemnation of the Bill of Rights, *both* on account of their degree and kind." (Emphasis supplied.) Id. 217 U.S. at 377, 30 S.Ct. at 553.

24. Supra, note 1.

25. N.C.Gen.Stat. § 14-3 (1927).

creased punishment based on prior offenses are perfectly proper; statutes which punish habitual offenders more severely than others do not violate the eighth amendment. E.g., Beland v. United States, 128 F.2d 795 (5th Cir.), cert. denied, 317 U.S. 676, 63 S.Ct. 157, 87 L.Ed. 543 (1942). The mode of punishment authorized is not inherently cruel or offensive, and the dissimilarity of Weems is apparent.

The novel position of petitioner that the Constitution requires that legislatures "tailor" punishment to "fit" the crime runs counter to a basic tenet of modern penology that punishment should be adjusted to the individual.[26] The penalty provisions of North Carolina's public drunkenness statute are flexible and permit individualization of punishment. Contemporary correctional knowledge and experience indicate that this approach is preferable.[27]

Petitioner further contends that "punishment which does not provide for treatment in order to cure or alleviate the defect which produced the offense" violates the eighth amendment. Petitioner offers no authority in support of his contention, and the court has found none.

■ Indulging the dubious assumption that our enlightened society is capable of ascertaining and treating the "defects" which "produce" offenses, there still remain valid objectives of criminal sanctions other than rehabilitation. Deterrence and isolation are equally permissible aims of punishment. Rudolph v. State of Alabama, 375 U.S. 889, 84 S.Ct. 155, 11 L.Ed.2d 119 (1963) (dissenting opinion). These objectives of the criminal law ultimately share a common goal: the prevention of crime. The eighth amendment does not question whether punishment achieves this goal through rehabilitation, deterrence, or isolation; it is concerned with decency, not rationality. "The Eighth Amendment expresses the revulsion of civilized man against barbarous acts—the 'cry of horror' against man's inhumanity to his fellow man." Robinson v. State of California, 370 U.S. 660, 676, 82 S.Ct. 1417, 1425 (1962) (concurring opinion). If North Carolina attempts to prevent or diminish public drunkenness by punishment designed to isolate or deter rather than rehabilitate, it is immaterial to the eighth amendment whether the choice is wise or unwise. The only question is whether the punishment violates "evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598 (1958). In determining the question in this case the court may properly look to the standards expressed by the forces of social responsibility which operate within legislative bodies and which are generated from without by the mores of society itself.

In the exercise of its expert understanding, Congress has enacted comprehensive legislation for the District of Columbia which recognizes that chronic alcoholics are sick persons in need of rehabilitative treatment.[28] The legislation authorizes the Municipal Court to suspend proceedings in any criminal case in which it appears that the defendant is a chronic alcoholic and, upon a finding of alcoholism, the court is authorized to commit the defendant for ninety days to a clinic for treatment; thereafter, he may be conditionally released, institutionalized for further treatment, or returned to the court for trial upon the original offense charged. The latter alternative coupled with the fact that the entire procedure is discretionary with the court[29] tends to indicate that the representatives of our maturing democracy, in the light of contemporary med-

---

26. See Allen, Criminal Justice, Legal Value And The Rehabilitative Ideal, 50 J.Crim. L., C. & P.S. 226 (1959).

27. "Measuring out punishment to fit the crime is a carry-over from ancient ignorance and barbarism. * * *" Elling-ton Protecting Our Children From Criminal Careers, 47 (1948).

28. 61 Stat. 744, D.C.Code § 24–501 et seq. (1947).

29. Peeples v. District of Columbia, D.C. Mun.App., 75 A.2d 845 (1950).

ical and other scientific knowledge, thought it less than barbarous action to imprison alcoholics.

Specialized institutional treatment designed to rehabilitate offenders is politically, socially, and economically desirable;[30] it is hardly a constitutional requisite, and failure of the State to provide such treatment does not appear to violate "standards of decency more or less universally accepted." State of Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 469, 67 S.Ct. 374, 379 (1947).

Joe B. Driver has not been committed to an alcoholic clinic or rehabilitation center, but that is not to say that his sickness is ignored by the State or that he will not receive proper medical treatment for his physical disabilities. On the contrary, it appears that he is confined in a prison field unit for physically handicapped inmates where he is not required to work; that comprehensive medical, dental, and psychiatric treatment is available; that petitioner has in fact received hospital treatment during his detention; that he is receiving medications prescribed by his unit physician; and that an active Alcoholics Anonymous group program is available to him at his unit.[31]

■ The final contention of petitioner is that a chronic alcoholic lacks criminal responsibility for acts caused by his alcoholism. In short, he argues that he is being punished for a crime he was powerless to avoid committing, and he urges

the court to recognize that his loss of self-control is indistinguishable from the loss of self-control suffered by the insane.

There is neither medical authority nor logical justification for equating chronic alcoholism and insanity. The several tests of criminal insanity as applied by various courts, whether M'Naughten,[32] Durham,[33] Currens,[34] Davis,[35] or the American Law Institute formulation,[36] all recognize that the prohibited act must result from mental disease or defect, either singly or in various combinations with the "defendant's *cognition,* his *volition,* and his *capacity to control* his behavior." Dusky v. United States, 295 F.2d 743, 759 (8th Cir. 1961), cert. denied, 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed. 2d 536. [Emphasis in original.]

The chronic alcoholic generally is cognizant of his condition and can distinguish between right and wrong. He lacks control to refrain from the use of alcohol, but it is not the use of alcohol that the North Carolina statute proscribes; it is the antisocial act of being drunk in public. The petitioner testified: "I consider myself an alcoholic. I want to do something about it, but it don't look like I can."

The lack of control of the chronic alcoholic is not the product of mental disease or defect and does not destroy his ability to understand what he is doing. Thus, it cannot be said that an alcoholic is insane in the legally accepted sense.

The application for a writ of habeas corpus is denied.

30. If Judges, state and federal, are to fashion sentences to fit the individual offender, it is necessary that Congress and the several state legislatures provide suitable facilities that can provide appropriate custodial care and medical and psychiatric treatment. Obviously, a Judge's efforts at rehabilitation of a sick offender, whether a chronic alcoholic, narcotic addict, or psycopath, are limited or defeated by the lack of necessary institutional facilities which only legislative bodies can provide.

31. A letter from George W. Randall, Director of the North Carolina Prison De-

partment, enclosing pertinent prison regulations, has been filed with the court.

32. Rex v. M'Naughten, 10 Cl. & F. 200, 8 Eng.Rep. 718 (1848).

33. Durham v. United States, 214 F.2d 862 (D.C.Cir.1954).

34. United States v. Currens, 290 F.2d 751 (3rd Cir. 1960).

35. Davis v. United States, 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750 (1897).

36. American Law Institute Penal Code, § 4.01(1), Proposed Official Draft (1962).