**Alford CUNNINGHAM, Petitioner-Appellant,**

v.

**John W. WINGO, Warden, Kentucky State Penitentiary, Respondent-Appellee.**

**No. 20465.**

United States Court of Appeals, Sixth Circuit.

May 28, 1971.

William Ronald Conner, Next Friend, on brief for appellant.

John B. Breckinridge, Atty. Gen., Joseph L. Famularo, Asst. Atty. Gen., Commonwealth of Kentucky, Frankfort, Ky., for appellee on the brief.

Before McCREE and MILLER, Circuit Judges, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

Alford Cunningham appeals from an order of the District Court dismissing his petition for a writ of habeas corpus without an evidentiary hearing.

Appellant had pleaded guilty to charges in several indictments in the Circuit Court for McCracken County, Kentucky, on May 23, 1967. After being sentenced to a total of 21 years' imprisonment on his guilty pleas, appellant, on September 24, 1968, moved to vacate the judgment and sentences. A hearing was held on appellant's motion to vacate on November 21, 1968, at which appellant and a number of other witnesses testified in a full evidentiary hearing, which was reported and transcribed by the official court reporter.

On December 2, 1968, Honorable C. Warren Eaton, Judge of the McCracken Circuit Court, denied the motion to vacate, and allowed petitioner to appeal from such order, in forma pauperis, to the Court of Appeals of Kentucky, which, in a comprehensive opinion, affirmed the Circuit Court. Cunningham v. Commonwealth, 447 S.W.2d 81.

Thereafter, appellant, on February 10, 1970, filed in the United States District Court his petition for a writ of habeas corpus which was denied by order of the Court on April 18, 1970; and, after a certificate of probable cause was entered by the Court and a motion to appeal in forma pauperis was granted, appeal was taken and the record was filed in this Court on May 18, 1970.

In this appeal are embodied contentions that cruel treatment of appellant in the jail in which he was confined was such that he was pressured into pleading guilty; that he was subjected to such mistreatment under the arbitrary orders of a deputy jailer, who was stabbed during an attempted jail break, because of an unfounded suspicion that appellant was implicated in that incident; and that appellant pleaded guilty on the understanding that he would receive a recommended sentence of ten years' imprisonment, whereas, instead, he received a sentence of twenty-one years' imprisonment.

While we are of the view the evidence discloses that appellant was subjected to cruel treatment during a period of three weeks during his incarceration of three months, and that such mistreatment resulted from the arbitrary orders of a deputy jailer, who was stabbed during the attempted jail break, it is our opinion, after an intensive study of the record, that appellant was not coerced or pressured into pleading guilty because of such treatment, but that his plea was a voluntary plea of guilty, and not in derogation of due process; and that appellant did not plead guilty upon the representation that a ten-year sentence would be recommended, instead of the twenty-one year sentence, which was imposed by the Court. We turn then to a more comprehensive statement of appellant's contentions, and a discussion of the evidence.

Appellant contends that his guilty plea was not voluntary but was due to cruel mistreatment in the jail during a period of incarceration up until the date on which his plea was entered, in violation of the due process clause under the United States Constitution.

Appellant's contentions are well stated in the language used by the Court of Appeals of Kentucky in Cunningham v. Commonwealth, *supra*:

"The ultimate proposition on which Cunningham rests his case * * * is that his treatment in the McCracken County Jail between April 6, 1967, and

May 23, 1967, 'was of such magnitude and of such duration and intensity so as to make his plea of guilty a product of duress and intimidation and not in fact the voluntary act of Appellant.'

" * * * He contends that the onerous conditions to which he was subjected, and the prospect of their indefinite continuation into the future had he chosen to go to trial on seven indictments, reduced him to such desperation that he was willing to accept any terms in order to get out of the McCracken County Jail."

While the Court of Appeals held against Cunningham on his appeal to vacate the order, it stated: "We do not doubt that a prisoner's free agency could be substantially eroded by cruel treatment." If a prisoner's free agency were substantially eroded by cruel treatment, his guilty plea entered as a result of such treatment would be invalid under the due process clause of the United States Constitution.

Appellant was arrested by the Paducah, Kentucky, City Police on February 18, 1967. He was then charged with six offenses: Four charges of storehouse breaking; one charge of forcibly demanding money with intent to rob; and one charge of taking and operating a motorcar without the consent of the owner. Two days after his arrest, he appeared in arraignment proceedings before the Police Court of Paducah, Kentucky. Honorable Robert L. Myre, Sr. was appointed attorney for him and, on advice of his attorney, appellant "waived to the grand jury" on all charges. He was then taken back to the jail.

Appellant testified that when he was first arrested, he was held in the Paducah Jail, and a few days later was confined to the McCracken County Jail; that, there, he was placed in a cell with a steel cot with no mattress; that he stated to the Commonwealth Attorney, during the month of his arrest, that he was willing to plead guilty to all offenses, if he would receive a total sentence of not more than ten years; that the Commonwealth Attorney came to the jail, or had appellant brought to his office on numerous occasions—at which times he told appellant he was going to ask that the Court impose a life sentence on appellant as an habitual criminal.

On March 22, 1967, appellant signed statements confessing the commission of the above-enumerated offenses to a police sergeant, who was accompanied by another police officer who signed as a witness to the confession. The witness to the confession was Officer Mallory Edwards. He was interrogated at considerable length by the Commonwealth Attorney on matters aliunde the confession. The confessions were never introduced into evidence. Although Edwards was called to testify as to the voluntariness of the confession of March 22, 1967, he was first asked:

"Q. Mallory, do you recall how many times that you brought him to my office for the jail break attempt over there, April the 6th, 1967?

A. To the best of my knowledge, two (2) times.

Q. Do you recall—were you present at all times in which conversations were had concerning the trouble that he was already in —the six charges?

A. Those two times, yes. I was present.

Q. What was the—what did I or was he told by anyone what sentence would be recommended for him?

A. 21 years. Well, first to try for life.

Q. All right. After then, the second time, what was he advised?

A. 21 years.

Q. Mallory, you took the confessions from him, is that correct?

A. I witnessed them. Mr.—the Sergeant Cunningham took them and I witnessed them.

> Q. The statements of his rights—was that read to him or did he read them?
>
> A. Each one was—he's very familiar with it. He even complained about the second or third time that he saw no need of going through it, we'd been through it. We said we'd go through each one.
>
> Q. All right. You read them to him each time?
>
> A. Each one.
>
> Q. And he signed them all?
>
> A. Each one.
>
> Q. Did he sign the confession on all the six offenses that he was held to the grand jury on?
>
> A. That's right.
>
> Q. Was that freely and voluntarily done?
>
> A. Yes, sir." [1]

According to the undisputed evidence, the Commonwealth Attorney told appellant about the time he signed the statement of confession, that he, the Commonwealth Attorney, would recommend a total sentence of twenty-one years for all offenses, if appellant would plead guilty. This was two months before appellant's plea of guilty was entered. Appellant claims, however, that the Commonwealth Attorney finally agreed to recommend a total ten-year sentence for all offenses, and it was for this reason only that appellant consented to plead guilty to the offenses in question. This, however, is denied by the Commonwealth Attorney. Up to this time appellant admitted that he had never been deprived of any meals in the jail.

We come, then, to the day of April 6, 1967, when there occurred an attempted jail break by several of the prisoners, in which Deputy Jailer Hersel King was repeatedly stabbed. This incident took place a little more than two weeks after appellant had signed the so-called confession statement, and after he had consented to plead guilty to all the offenses, if the Commonwealth Attorney would recommend a total ten-year sentence.

At the time of the attempted jail break, appellant was deprived of all food for a period of four days; and from there on was given only one meal every three days for a period of two weeks. He was then transferred to the "black cat," a punishment cell, and received one meal a day thereafter during his detention in the jail until his plea of guilty. In the "black cat," there was no mattress

---

[1]. It is admitted that the Commonwealth Attorney told appellant that unless he pleaded guilty to all offenses charged against him, and agreed to a recommended sentence of a total of 21 years, the Commonwealth Attorney would try appellant each term of court on each of the six offenses, and that he would be held in jail for a trial every four months on each indictment—or for a total period of two years—and that further, he would be tried as an habitual criminal carrying a life sentence. This is a practice that is not commendable. If followed out by the prosecutor in case a guilty plea were not entered, it would add to the great number of prisoners held in jails for long periods pending trial, and would unduly burden the courts with six or seven trials, dragged over this long period, instead of one trial.

In *The Challenge of Crime in a Free Society*, published by the President's Commission on Law Enforcement and Administration of Justice (1967), the negotiated guilty plea is an acknowledged procedure made primarily necessary by the fact that approximately 90 percent of all defendants enter guilty pleas. The advantages to be derived from an acceptance of this procedure are fully summarized but, in approving the end result, the Commission issued this caveat (p. 135):

"At the same time the negotiated plea of guilty can be subject to serious abuses. In hard-pressed courts, where judges and prosecutors are unable to deal effectively with all cases presented to them, dangerous offenders may be able to manipulate the system to obtain unjustifiably lenient treatment. There are also real dangers that excessive rewards will be offered to induce pleas *or that prosecutors will threaten to seek a harsh sentence if the defendant does not plead guilty*. Such practices place unacceptable burdens on the defendant who legitimately insists upon his right to trial. * * *" (Emphasis supplied.)

on the steel cot, and only one window for ventilation which was not permitted to be opened by anyone except an officer. That window was kept closed. On the ceiling of the cell were four large light bulbs, which were burning day and night. With the window closed, the heat from the light bulbs would, as appellant expressed it, "kill you."

The reason appellant was placed in the "black cat" was because Deputy King thought he was implicated in the prison affray and break. It appears that Deputy King had been called by White, a prisoner, to talk over his situation. King went up to ask him what he wanted and, as King testified:

"White slipped up behind me and pulled an electric cord around my neck, pulled it tight, pushed me up to the bar, and Raymond Ellis come at me with a knife and chopped me all to pieces. I turned around and he gave the knife to White. He worked me over. I told him if they wanted to get out, the keys was downstairs. White said, 'Let's go get 'em.' So Ellis told White to get them and to finish the son of a bitch off quick. White went to get the keys. He called Orbie Reed over there to help him hold the cord. When Orbie Reed took over the cord, it got some slack and I got loose from 'em. I met White coming back with the keys and I knocked him down. Murphy was coming up there to see what was going on. I told him to take White. He took him downstairs and come to and was fighting Murphy. I told him to quit and he didn't quit. I hit him again and he did quit. I locked him up."

Then comes the important testimony of King with reference to appellant on cross-examination:

"Q. All right. What participation did Mr. Cunningham have in this?

A. *I don't know.* White said that he gave him the knife and Murphy said he handed it back out. That's all I know." (Emphasis supplied.)

This is in accord with appellant's testimony that White pitched the knife onto the walk in front of appellant's cell after the cutting of King. Murphy, a deputy jailer, was the person to whom Cunningham handed back the knife; and Murphy was the man who caught White and broke up the escape. King had no knowledge of any participation of Cunningham in the affray. Appellant was in cell block numbered 5. The other prisoners implicated in the assault on King and the attempted jail break were in cell block numbered 6. These blocks are back to back, and are separated by a steel corridor. No one in cell block numbered 5 could see anything that went on in cell block numbered 6. There was no evidence whatever that appellant was implicated in the cutting affray or in the jail break; but that is the only reason he was put in the "black cat."

Appellant was confined to the "black cat" for forty-seven days. He was told, he testified, by Deputy Jailer Hersel King, that if he pleaded guilty, he would be fed, his visits would be reinstated, he could write to his people, and he would be given a mattress. During the three months he was in McCracken Jail, appellant testified he was not allowed to write any letters, and that Hersel King told him he would not be allowed to talk to anybody outside the jail. He testified he was knocked down and kicked in the mouth when he was put in the "black cat" and his teeth were knocked out by King. This, however, was denied by King.

Appellant's testimony as to his being deprived of all food for four days after the attempted prison break, and for two weeks thereafter being given only one meal every three days—and then one meal a day from that time on, is undisputed.

Appellant was afterward indicted on a charge of "Malicious Cutting with Intent to Kill."

The jailer of the McCracken County Jail was Russell Jones. Deputy Jailer King was the one who decided the meals the prisoners were to receive and what

meals they were not to receive. As Jailer Russell Jones put it:

"That's the way we worked. If anything like that happened (a jail break) while he was on duty or the other person on duty * * * I leave that up to them. * * * This was a matter in his absolute discretion."

King testified he decided appellant was to have one meal a day. He was asked:

"Q. All right now there's been some testimony today concerning the fact that neither Mr. Ellis, Mr. Reed or Mr. Cunningham received any meals whatsoever in the McCracken County jail for the next four days after this incident and until Sunday, noon Sunday. Do you know anything about whether or not they received any meals on this occasion?

A. It was my understanding they were getting one meal a day which was at noon. They didn't get any at night, or breakfast while I was on duty.

Q. So the testimony that they have given concerning the fact that they received no meals whatsoever for four days, you don't know anything about that?

A. I don't know if they—they didn't get anything at night or in the morning but they may have gotten it at noon. It's my understanding they got one meal a day.

Q. What were your hours working during this time?

A. Four (4) in the afternoon until seven (7) the next morning.

Q. So you don't know what meals they received prior to the time that you arrived, is that what you're saying?

A. That's right.

Q. And in whose direction were their privileges for the evening meal suspended?

A. Mine.

Q. And what did you direct in this regard concerning the suspension of their evening meal?

A. Until I got ready for them to have a meal.

BY THE COURT: I didn't understand you.

WITNESS: Until I got ready for them to have a meal.

BY THE COURT: Until you got ready?

WITNESS: Un-huh.

Q. Now was it also your direction that they were to spend the time in the Black Cat?

A. Yeah.

Q. Without mattress?

A. Yeah.

Q. And not to have the lights turned off?

A. Yeah.

Q. Not to have the window open?

A. Yeah. They were too dangerous to risk."

Appellant's testimony of his being deprived of food is undisputed, therefore, by Deputy Jailer Hersel King, and there was no other testimony by anyone that contradicted appellant's testimony in this regard.

When counsel, an able and highly-respected lawyer, was appointed on arraignment day for appellant, appellant told him he wanted to plead "not guilty." The attorney then testified that he took appellant into a side room and asked him whether he was guilty on these six counts:

"And my recollection now is that he said he was. Well, I said 'what do you hope to get out of trying these six (6) felony cases except possibly a sentence. And if you're guilty on them all, maybe you'd better let me see what I can do with the Commonwealth Attorney about arranging to enter a plea of guilty and see what concessions the Commonwealth Attorney would agree to, that the court would go along.' And he said for me to go ahead and do that. Now I went and talked to Mr. Jones about the matter, I recall, and we took up each one of these separate indictments and I think that he indicated on these indictments what he wanted to recommend as a verdict or a penalty. And I think he also told me and

I think I told Mr. Cunningham that with these six (6) felony indictments against him that there was a possibility that if he didn't plead guilty, that they'd take an indictment against him as a habitual criminal under the Habitual Criminal Act, it might be that the best thing for him to do would be to plead guilty on them provided he could get a minimum sentence on each one of them. I didn't try to remember how much each one of them was. I don't recollect even what the offense was, but my recollection was that most of them was about the lowest sentence he could get. And I reported that back to him and we talked about it and my recollection was that I advised him that if he went in there and tried one of these cases and they come along here and convicted him, then they went along and had the same jury and tried another one that the jury possibly would make it hard on him and give him maybe the maximum sentence on all of them. And my advice would be to him, in view of the fact that he admitted being guilty of these six (6) offenses, would be to take the sentences that the Commonwealth would recommend and try to forestall any indictment under the Habitual Criminal Act and to that, my recollection was now, he agreed. And we come in here and entered that kind of plea without the intervention of a jury. It's my recollection and that's just by memory now.

\* \* \* \* \* \*

Q. Did you specifically explain to him that under the agreement that had been discussed between you and Mr. Jones that they were to run consecutively and what consecutively meant? \* \* \* Let's look first of all at the sentences he actually received. He received a maximum of ten (10) years on the robbery.

A. Yeah.

Q. And the lowest was the one year on taking a motor vehicle.

A. Yeah.

Q. The other sentences were two and three years?

A. That's right.

\* \* \* \* \* \*

Q. Did you consult with Mr. Cunningham on any occasions other than when you were with him at city court on the day of arraignment?

A. Well, you see on the day of arraignment, arraignment day, I mean on the waiver at city court I talked to him down there and then I talked to him out in the hall about the matter and we discussed, if I recall, rather than take up the court's time and all like that, in place of having to place witnesses on the stand for an examining trial that I thought it would be better to waive them. And I think we agreed on that and then waived. Now after indictments were returned up here I don't know how many times I talked to Mr. Cunningham but I talked to Mr. Jones, it's my recollection, some two or three times or more. Maybe I'd go out and talk to him, Cunningham out there, and come back in and talk to Jones. I'm just—that's a custom I had. I don't know that that's true in this case but I tried to acquaint Mr. Cunningham with what I could do and the best I could do on the thing, and I think we discussed the possibility maybe of some of these charges maybe in getting a longer term than what we could agree on.

Q. Did you consult Mr. Cunningham on any other occasion than what we've already referred to?

A. I just don't recall. It just seems to me like that I talked to, it seems to me like that I talked to him—I don't know whether I was in Jones' office or not when I talked to him. I maybe talked in Jones' office to Jones but I don't know whether he was along or not. In other words, I went to Jones to see before we ever come in here on the day of arraignment to see what I could work out. That's my recollection of it.

\* \* \* \* \* \*

Q. Well, again, let me get my complete question in. Were you certain that Mr. Cunningham understood that the sentences were to run consecutively and not concurrently?

A. *I don't know whether he understood that or not. He was told that,*

*now whether he understood it or not that'd be a matter of his mind, not mine.*

Q. All right did you tell him or did Mr. Jones tell him that they were to run consecutively?

A. My report was if I understand it when I went and talked to Mr. Jones about the best deal I could make with him rather than to have the trial was that he'd take the sentences as agreed on and that he'd have to serve that amount as agreed on or maybe one or two that he said *he'd let it run consecutively.* Now that's just by memory.

BY THE COURT: You mean concurrently?

WITNESS: *I mean one of them would run concurrently*—yes.

Q. All right now so it was you that told Mr. Cunningham, not Mr. Jones?

A. Mr. Jones told him that in here, it's my recollection, in the presence of the court. Also told him what had happened after we discussed it out here in the anteroom and after I'd come in here and talked to Mr. Jones maybe once or twice about the matter. Then we brought Mr. Cunningham up in front of the bench up here and explained this thing to him.

Q. Now who explained it to him?

A. Mr. Jones and the court explained it to him is my recollection about it.

Q. All right now did you explain it to him about the consecutive term?

A. I explained to him about what Mr. Jones would settle for out in the anteroom.

Q. Did you inquire of Mr. Cunningham as to whether or not he understood the meaning of consecutive or concurrent?

A. I don't recall that. I'd think a man that's been in as many offenses as he's been charged with, he'd know whether they're consecutive or not. I know that he said he'd have to serve the sentence except the one that was going to run together. I know Mr. Jones told him that and told me that and I told him that. Whether he understood it or not, now that's a matter I don't know.

Q. Well, was there any doubt in your mind at that time?

A. I don't think so. I don't think there's any doubt in my mind at all but what Mr. Cunningham understood all the facts about the matter and not only that but was glad at that time I could make the deal that I did was my understanding of it." (Emphasis supplied.)

In regard to the sentence of twenty-one years, appellant said that although he signed the confession above mentioned, he refused to plead guilty until the total sentence would be ten years instead of a life sentence. The Commonwealth Attorney testified he would not agree to this, but receded from his original plan of recommending a life sentence (as an habitual offender), to a twenty-one-year sentence.

The controversy between appellant and the Commonwealth Attorney as to the sentence, is reduced to a dispute as to whether it was agreed that appellant would receive a ten-year sentence or a twenty-one-year sentence. Appellant, claiming it was understood it would be a ten-year sentence, finally agreed, after three months in jail, to plead guilty to all counts, but testified, on the hearing of his motion to vacate sentence, that he refused to plead guilty until a ten-year sentence was determined upon. The trial judge, Honorable C. Warren Eaton, in denying the motion to vacate, stated: "The evidence indicates that Mr. Jones (the Commonwealth Attorney) and myself advised him that the sentences were running consecutively, with the one exception * * *."

After submission of the case in this Court, we requested the Attorney General of Kentucky to furnish a transcript of the proceedings in the McCracken County Court when appellant entered his plea, but were thereafter informed by the Attorney General that those proceedings were not reported by the official court reporter and, therefore, no transcript was available. This statement was supported by the certificate of the Clerk of the McCracken County Court. However, a certified copy of the order of the Cir-

cuit Court in the case of Commonwealth of Kentucky v. Cunningham was furnished this Court, and appears in the margin.[2]

From the Order, it does not appear that the sentences were to be served concurrently or consecutively, or in such a fashion that the total of all sentences would amount to ten years, as claimed by appellant. It is stated by the Commonwealth Attorney that the sentence on the count charging "Malicious Cutting with Intent to Kill" was to run concurrently with the sentence on one of the counts for "Storehouse Breaking," each for two years. But the Commonwealth Attorney insisted that, with these two concurrent sentences, the total sentence on all counts would aggregate twenty-one years.

The evidence supports the conclusion that appellant knew that the least total sentence agreed upon by the Commonwealth Attorney to be submitted to the Circuit Court as the recommended sentence was to be twenty-one years; and that appellant, when he appeared before the Court, failed to make known any reason why judgment should not be pronounced in line with the recommendations made to the Court, and in the presence of the appellant, by the Commonwealth Attorney, as to the sentences running consecutively, except for the sentence for malicious cutting and wounding. Moreover, the Circuit Judge stated, in denying vacation of sentence, that the Commonwealth Attorney and the Judge, himself, advised appellant of his rights, and "advised him that the sentences were running consecutively with the one exception." In his order denying vacation of sentence, the Judge stated: "The Court and Mr. Jones advised him [appellant] that he would receive a total of twenty-one (21) years as a result of all the sentences except one (1), being fixed to run consecutively."

The trial judge, in his order denying vacation of sentence, further stated, contrary to appellant's claims in that proceeding, that: "No where does it appear

2.
McCRACKEN CIRCUIT COURT

On the 23rd. day of May, 1967, the following order was entered herein, to-wit:

*COMMONWEALTH OF KENTUCKY*            *PLAINTIFF*

VS. Nos. 10088, 10091, 10092 & 10093 "Storehouse Breaking"
No. 10089 "Taking & Operating Motor Vehicle Without Consent of Owner"
No. 10090 "Forcibly Demanding Money With Intent to Rob"
No. 10103 "Malicious Cutting With Intent to Kill"

*ALFORD CUNNINGHAM*            *DEFENDANT*

---

Defendant * appeared * in open * court, * and being unable to employ counsel to represent him, Hon. R. L. Myre, Sr., a regular practicing attorney of this court was appointed to represent defendant in each of the foregoing indictments. In each of the 7 above cases, defendant acknowledged identity of person, was given a copy of each indictment and the court stated and explained the substance of the charges to him in each case. To each indictment defendant entered plea of guilty and by agreement of parties these indictments were submitted to the court for trial without the intervention of a jury, and by agreement of the Commonwealth Attorney and the defendant, with advice of counsel, it is ordered by the court as follows: Defendant is ordered to serve three (3) years in the penitentiary under Indictment No. 10088; defendant is ordered to serve one (1) year in the penitentiary under Indictment No. 10089; defendant is ordered to serve ten (10) years in the penitentiary under Indictment No. 10090; defendant is ordered to serve three (3) years in the penitentiary under Indictment No. 10091; defendant is ordered to serve two (2) years in the penitentiary under Indictment No. 10092; defendant is ordered to serve two (2) years in the penitentiary under Indictment No. 10093; defendant is ordered to serve two (2) years in the penitentiary under Indictment No. 10103.

/s/ C. Warren Eaton, Judge

that his pleas of guilty were involuntarily made by him because he wanted to be removed from the McCracken County Jail."

On the record before us, we must accept appellant's undisputed testimony that he was treated with cruelty[3] in being deprived of food for so many days at a time while he was being held for trial in the McCracken County Jail. This mistreatment suffered by appellant while in jail, in April 1967, resulted not from pressure exerted upon him to plead guilty, but from an unfounded suspicion that appellant was implicated in the attempted jail break and stabbing of the jailer. It appears, however, that on March 22, 1967, more than three weeks before any such treatment—appellant wanted to plead guilty on the condition that he would receive a total of ten years' imprisonment. There is no evidence that appellant ever denied committing the felonies with which he was charged—except that of "Malicious Cutting with Intent to Kill," which was without any evidence in the record to sustain it, and the sentence on which was made to run concurrently with a sentence on another

---

3. With regard to the standard for determining cruel and unusual punishment, certainly one of the standards is "the wanton infliction of pain," or conduct which "shocks the most fundamental instinct of civilized man," Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 463, 67 S.Ct. 374, 376, 91 L.Ed. 422; or a method of punishment which violates the "evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630. The Eighth Amendment "is not fastened to the obsolete," Wright v. McMann, 387 F.2d 519, 525 (C.A.2); as an instance, "the use of the strap * * * is punishment which, in this last third of the 20th century, runs afoul of the Eighth Amendment; the strap's use, irrespective of any precautionary conditions which may be imposed, offends contemporary concepts of decency and human dignity and precepts of civilization which we profess to possess; * * *" Jackson v. Bishop, 404 F.2d 571, 579 (C.A.8). What Judge Feinberg said in Sostre v. McGinnis, Commissioner, et al., 442 F.2d 178 (C.A.2), although in a dissenting opinion, is here apposite: "What might once have been acceptable does not necessarily determine what is 'cruel and unusual' today. * * * In this Orwellian age, punishment that endangers sanity, no less than physical injury by the strap, is prohibited by the Constitution. Indeed, we have learned * * * that true inhumanity seeks to destroy the psyche rather than merely the body."

It cannot be considered that depriving an accused in jail awaiting trial, of food, as in this case, is within the scope of proper prison discipline. As Judge Kenneth Keating of the New York Court of Appeals, in Brabson v. Wilkins, 19 N.Y. 2d 433, 280 N.Y.S.2d 561, 227 N.E.2d 383 (1967), said:

"No valid reason, other than the shibboleth of prison discipline, has been advanced in the denial of this right in the case before us. I believe that courts should look behind inappropriate slogans so often offered up as excuses for ignoring or abridging the constitutional rights of our citizens."

Depriving prisoners of food is a device of totalitarian governments for so-called discipline. In "The Russian Secret Police," by Ronald Hingley (Hutchinson and Co., London, 1970), the author refers to Anatoly Marchenko, who wrote "My Testimony" (1969), described as "one of the most important illicit documents to have come out of the Soviet Union, being an account of recent concentration camp and prison conditions. The author was himself a political prisoner in 1960–6, and was rearrested on 29 July 1968. He has reputedly been retried since then on some charge arising from the publication of his book abroad. In his account, as in other available descriptions, one particular abuse looms larger than all others —the continued use of semi-controlled starvation as a means of keeping the prisoners submissive and depressed. From this and other evidence it appears that the maximum daily food issue for a political prisoner contains no more than 2,400 calories, the quantity established as adequate only for a ten-year-old child, besides being deficient in vitamins and fats. For those who * * * infringe prison discipline, the ration may be cut to 1,300 calories. * * * In their despair prisoners have resorted to fantastic procedures of self-mutilation, swallowing items of cutlery and glass * * *. One man tattooed * * * his ear and flung it at a warder. * * * Such indiscipline only led to further repressions." (p. 260)

count. Appellant had previously served four prison sentences for commission of felonies, and was out on parole at the time he was arrested for the felonies charged in this case. His chief complaint now may be said to be that it was represented to him that his guilty plea would result in a total ten-year sentence, rather than the total twenty-one-year sentence, which he received.

What may clarify the tangled situation before us is that it can be stated with certainty that if appellant had received a sentence for a total of ten years' imprisonment for the seven felonies to which he pleaded guilty, instead of a total twenty-one years' imprisonment, he would not have brought any proceedings with regard to this case in any courts, including the present habeas corpus proceeding. Admittedly, he would have been satisfied with a ten-year sentence.

The cruelty of depriving appellant of all food for four days at the time of the attempted jail break, and subsequently giving him only a small bowl of food every third day for two weeks during April 1967, on, what the record shows, was an unproven, unfounded suspicion that he was implicated in the jail break —this inhumane treatment is not relevant to, and does not affect the validity of, the trial court's sentence. For appellant had informed the Commonwealth Attorney that he was ready to plead guilty to the first six indictments as early as March 22, 1967, before he ever suffered any deprivation of food or confinement in the "black cat." At that time he was willing to plead guilty provided he would receive a sentence of ten years instead of twenty-one years, and this is in keeping with his position at the present time. From March 22, 1967, until May 23, 1967, when he pleaded guilty and was sentenced, appellant can be said to have repeatedly attempted to bargain with the Commonwealth Attorney as to the sentence that would be recommended, and which the court, presumably, would impose upon him; and, during all of this period, appellant's efforts were directed to trying to induce the Commonwealth Attorney to recommend a sentence of ten years instead of twenty-one years.

The most careful scrutiny of the record is convincing that appellant has not been deprived of due process of the law under the United States Constitution because of an involuntary plea of guilty caused by mistreatment and pressure exerted upon him so to plead.

Under the circumstances above outlined, and in the light of the evidence in the case, as set forth by the trial judge in the McCracken Circuit Court, as appeared in the transcript of evidence on the hearing of appellant's motion for vacation of sentence, we find no deprivation of due process of law, or error in the refusal of the Court to vacate the sentence; and we find no error in the denial of the writ of habeas corpus by the District Court.

Other contentions advanced by appellant have been carefully considered, but we find them not meritorious.

The order of the District Court is affirmed.